UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHAEL SWIATKOWSKI,

                 Petitioner,                                  Hon. Paul L. Maloney

v.                                                    Case No. 4:06-CV-47

MARY BERGHUIS,

                  Respondent.

_____/


## REPORT AND RECOMMENDATION

         This matter is before the Court on Swiatkowski's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Swiatkowski's petition be **denied**.


## BACKGROUND

         As a result of events which occurred in May and/or June 2000, Petitioner was charged with one count of first degree criminal sexual conduct and one count of second degree criminal sexual conduct. (Trial Transcript, March 5, 2002, 10-11). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Buffy Mallo**

        In the spring of 2000, Petitioner, his wife, and their young daughter moved into the neighborhood where Mallo lived with her husband and children.  (Trial Transcript, March 13, 2002, 35-38).  As of this date, Mallo's daughter, Ashley Abrams, was twelve years old and completing the seventh grade.  (Tr. 35-39).

        Soon after moving into the neighborhood, Petitioner and his wife asked Mallo if Ashley would be interested in babysitting for them in the afternoon during the time period between Petitioner's wife leaving for work and Petitioner returning home from work.  (Tr. 38).  Mallo and Ashley agreed and Ashley began going to Petitioner's residence to babysit after arriving home from school in the afternoon.  (Tr. 38-40).  Petitioner "was supposed to send [Ashley] home" once he returned home from work, but Ashley "sometimes" would remain at Petitioner's house "for awhile." (Tr. 40).

        Ashley "sometimes" accompanied Petitioner to another house.[1]  (Tr. 41).  On two occasions, Ashley accompanied Petitioner and his daughter to the Al Capone House so that she could babysit Petitioner's daughter while Petitioner mowed the lawn.  (Tr. 42-43).  Ashley's trips to the Al Capone House all occurred before she turned 13 years old on July 1, 2000.  (Tr. 42).

        Upon returning from her second trip to the Al Capone House, Ashley "went to her room" and "was kind of distant."  (Tr. 43).  Mallo began to notice a change in Ashley's behavior. (Tr. 43).  Ashley began to cry "a lot" and "was mean to her sisters."  (Tr. 43).  She was also "kind of harsh and kind of angry all the time, and it seemed like she was constantly picking on somebody,

---

[1]  Later testimony revealed that this house was owned by a "Youth Baptist Camp."  (Tr. 57-58, 95).  The house was generally referred to (locally and during the trial) as the Al Capone House because it was believed that Capone once resided there.  (Tr. 95).

and she was angry. . .and she didn't hang out with the family as much." (Tr. 43-44). Ashley later began asking her mother if she could "take a friend with [her] to babysit." (Tr. 44). Mallo told Ashley that she could not take a friend to babysit because "it was a job." (Tr. 44).

Later that fall, Ashley reluctantly told her mother that Petitioner had "raped" her. (Tr. 45). When Ashley told her mother what had happened, she was "hysterically crying." (Tr. 46). The following day, Mallo and Ashley reported the matter to the police. (Tr. 48). After telling the police what had occurred, Ashley's personality changed and she "seemed more relieved." (Tr. 48).

**Ashley Abrams**

Ashley began babysitting for Petitioner in the spring of 2000. (Trial Transcript, March 13, 2002, 54). On the days that Petitioner's wife was scheduled to work, Ashley would babysit from the time Petitioner's wife left for work until Petitioner returned home from work. (Tr. 55-56).

Ashley testified that Petitioner sexually assaulted her on several occasions. Petitioner first exposed himself to her at his residence. (Tr. 56-57). On a subsequent occasion, Ashley accompanied Petitioner and his daughter to the Al Capone House so that she could care for Petitioner's daughter while Petitioner mowed the lawn. (Tr. 57-59). After arriving at the house, Ashley, Petitioner, and Petitioner's daughter went inside to eat. (Tr. 59-61). While Ashley and Petitioner were sitting on the couch, Petitioner "stuck his finger inside of" Ashley. (Tr. 60-61).

Petitioner then led Ashley upstairs. (Tr. 61-62). While climbing the stairs, Petitioner "leaned [Ashley] up against" the railing and attempted to penetrate her with his penis. (Tr. 62-63). Petitioner then led Ashley to a bedroom where he showed her a magazine containing photographs

of nude teenage girls. (Tr. 64-66). Petitioner asked Ashley to pose "like a girl in that magazine." (Tr. 66-67). Ashley "pulled [her] pants down and sat on the floor" and asked Petitioner if he was going to take any pictures of her. (Tr. 67-68). Petitioner responded, "do you think I'm stupid?" (Tr. 68). Petitioner then showed Ashley a shoe box filled with "dildos and nasty things." (Tr. 68-70).

Ashley accompanied Petitioner and his daughter to the Al Capone House a second time later that spring. (Tr. 71). On this occasion, Petitioner led Ashley upstairs to his daughter's room. (Tr. 73-74). While Ashley was laying on the bed, Petitioner removed Ashley's shorts and "licked [her] crotch." (Tr. 74-75). Petitioner told Ashley, "I found your ticklish spot." (Tr. 75).

These incidents all occurred before Ashley's thirteenth birthday. (Tr. 77). Ashley did not tell her mother about these incidents because she was scared. (Tr. 79). Ashley eventually told her best friend, who persuaded Ashley to tell her mother. (Tr. 79-80). After Ashley reported the matter to the police, "people" began making fun of her and accused her of lying. (Tr. 80-81). In response, Ashley told several people that "it didn't happen" so "they wouldn't make fun of [her] and because she "didn't want everybody to know." (Tr. 81-83).

**Bryan Campbell**

As of October 4, 2000, Campbell was employed as a Detective Sergeant for the St. Joseph County Sheriff's Department. (Trial Transcript, March 13, 2002, 94-96). On this date, Sergeant Campbell executed a search warrant at the Al Capone House. (Tr. 95-96). During this search, Campbell seized three magazines containing "explicit hardcore" pictures of the "youngest girls allowed by law." (Tr. 102-05). Campbell also observed, but did not seize, other pornographic magazines. (Tr. 103).

**James Henry**

Henry testified that he earned a Ph.D. in social work and developmental psychology. (Trial Transcript, March 13, 2002, 107-08). Dr. Henry indicated that he operated a trauma center for abused children and was an associate professor at Western Michigan University. (Tr. 108). Dr. Henry was recognized by the trial court as an expert in the field of child sexual abuse. (Tr. 111).

Dr. Henry testified that "[i]t's very unlikely that children when they're being sexually abused disclose immediately." (Tr. 113). The doctor further stated that "it's a very common phenomenon in terms of child abuse when adults in an authority position would sexually abuse a child, that they would not tell." (Tr. 113). Dr. Henry testified that children under the age of fifteen often do not disclose their abuse because of "fear, shame, and guilt." (Tr. 113-14). Dr. Henry also testified that he would not find it "unusual" if a 12 year old victim of sexual abuse "continue[d] to have contact with the person that abused them." (Tr. 114-15). The doctor testified that it was "common" for the victim to disclose the abuse "to another peer-aged friend." (Tr. 116-17).

Dr. Henry testified that "anywhere from 5 percent to 25 percent of the time," a child victim of sexual abuse will "recant and later tell somebody that it did not happen." (Tr. 120-21). The doctor indicated that this occurs because (a) the child does not want to feel responsible for sending their abuser to jail, (b) the victim feels shame, and (c) the cruelty of the victim's peers. (Tr. 120-22). Dr. Henry also testified that sexual abusers will "frequently" expose their child victim to "pornographic material" and "sex toys." (Tr. 123-24).

**Shirley Straka**

Straka testified that she was a vocal music teacher in the Three Rivers Community

schools. (Trial Transcript, March 13, 2002, 130-31). Ashley Abrams was a student in Straka's class during her seventh and eighth grade years. (Tr. 131). At the conclusion of her seventh grade year, Ashley was "ma[king] progress" and "was really getting a good focus." (Tr. 134-35). When Ashley returned for her eighth grade year, however, she began exhibiting behavioral problems. (Tr. 133-35). Specifically, Ashley was "very argumentative" and inattentive. (Tr. 133-35).

**Leslie Swiatkowski**

Leslie Swiatkowski is Petitioner's wife. (Trial Transcript, March 13, 2002, 137). In May 2000, Ashley Abrams began babysitting for the Swiatkowskis. (Tr. 137-38). In addition to babysitting, Ashley would often go to the Swiatkowski residence to "play with" their daughter. (Tr. 139). Ashley "often" stayed the night at the Swiatkowski's residence, sleeping in their daughter's room. (Tr. 143). During that summer, Ashley accompanied Petitioner to the Al Capone House. (Tr. 139-40). Ashley "pretty well begged" to accompany Petitioner on these trips. (Tr. 140). Ashley told Leslie Swiatkowski that she "didn't get along with her stepdad, and that he favored her stepsister." (Tr. 142). Ashley was "unhappy with that." (Tr. 142). Earlier that year, Petitioner started a business selling "adult sex toys [and] novelties." (Tr. 142). Ashley never exhibited an interest in the items that Petitioner was selling. (Tr. 142-43).

Ashley stopped babysitting at the end of July when Petitioner "quit his job." (Tr. 138). In September, Petitioner obtained another job, at which point the Swiatkowskis needed to again locate a babysitter. (Tr. 144). They declined to rehire Ashley, however, "because the way she talked and acted around [their daughter], and the way she talked around [Leslie Swiatkowski and Petitioner]." (Tr. 144). When asked to "describe some examples" of this behavior, Swiatkowski

testified that "[w]ell, there was one time that [her daughter] came up to us, and she had - one of those long balloons that you make into animals, and she put it up to herself and said she was peeing, and that wasn't like her, and it shocked both of us." (Tr. 144). Swiatkowski offered no other examples.

### Michael Dombrowski

Dombrowski testified that he had known Petitioner for "quite a few, many years." (Trial Transcript, March 14, 2002, 4). Dombrowski testified that Petitioner has a reputation as being an "honest man" and that if Petitioner told him something, he "would believe it." (Tr. 4-5).

### Michelle Berkey

Berkey testified that she had known Petitioner for "going on three years now." (Trial Transcript, March 14, 2002, 6). Berkey testified that she trusted Petitioner and could vouch for his honesty. (Tr. 6-7). On August 26, 2000, Berkey babysat for Petitioner and his wife at the Swiatkowski residence. (Tr. 7). Ashley was also present and "stuck around pretty much the whole night." (Tr. 7). To Berkey, Ashley "came across. . .as a girl that said many things that I would not think she would say." (Tr. 7). Ashley "tried to get [Berkey] to leave on many occasions so she could be there alone." (Tr. 7). Ashley also "tried to get into the bedroom. . .roughly, ten times and [Berkey] kept trying to get her out of the bedroom." (Tr. 7-8). Ashley later telephoned her mother to ask if she could spend the night at the Swiatkowski residence. (Tr. 8).

### Andrew Richmond

Richmond testified that he had known Petitioner for "five or six years at least." (Trial

Transcript, March 14, 2002, 10). Richmond testified that he could vouch for Petitioner's honesty and would "trust" Petitioner if he told him something. (Tr. 10). Sometime in mid-July 2000, Richmond traveled to the Al Capone house to meet with Petitioner. (Tr. 10, 15). When Richmond arrived at the house, Petitioner was there with "[a] young lady that was a babysitter." (Tr. 10-11). Richmond was unable to recall her name. (Tr. 11).

**Kevin Roberts**

Roberts testified that he had traveled to the Al Capone House with Petitioner, but that he was never there when Ashley Abrams was there. (Trial Transcript, March 14, 2002, 22).

**Nikita Diderich**

Diderich spent the night at Ashley Abrams' residence "a few days after" Abrams alleged that Petitioner sexually assaulted her. (Trial Transcript, March 14, 2002, 23-24). That evening, Abrams told Diderich that "nothing happened. . .Mick didn't rape me." (Tr. 24-25). A "few days later" Abrams encountered Petitioner on the street. (Tr. 26). Abrams approached Petitioner's car, said, "Hi, Mick," and then "stuck her head in the driver's seat" and began talking to Petitioner and his daughter. (Tr. 26-27). Abrams later "started talking about it to everybody that she was raped." (Tr. 29).

**Steven Brown**

Brown testified that he overheard Ashley Abrams state, "no, I never got raped." (Trial Transcript, March 14, 2002, 32-34). Brown was sitting behind Abrams on a bus when she

made this statement.  (Tr. 33-34).

**Michael Swiatkowski**

Petitioner testified that Ashley Abrams began babysitting his daughter in the "later part of May 2000."  (Trial Transcript, March 14, 2002, 37-38).  Ashley would babysit "probably three, four times a week."  (Tr. 38).  Ashley was a good babysitter.  (Tr. 38).  Petitioner quit his job on August 4, 2000.  (Tr. 38-39).  Through August and September, Ashley continued to visit the Swiatkowskis "two, three times a week, maybe even four, just usually to play with my daughter and just hang out."  (Tr. 39).  When Petitioner returned to work in October, he and his wife decided to locate a different babysitter.  (Tr. 40-41).  The Swiatkowskis made this decision because they "didn't like [Ashley's] attitude and the way she talked about things; brought up sex and stuff a lot in front of [their] daughter."  (Tr. 41-42).  Petitioner asserted that he did not sexually assault Ashley Abrams.  (Tr. 37).

Petitioner acknowledged that Ashley accompanied him on two occasions to the Al Capone house.  (Tr. 40-41).  Petitioner also acknowledged they he used the Al Capone house to operate his "sex novelties and adult toys" business without seeking the approval of the church that owned the property.  (Tr. 45-46).  Petitioner acknowledged that he purchased the pornographic magazines recovered from the Al Capone house.  (Tr. 46).

Following the presentation of evidence, the jury found Petitioner guilty of one count of first degree criminal sexual conduct and one count of second degree criminal sexual conduct.  (Tr. 102-03).  Petitioner was sentenced to serve 6-15 years in prison on the second degree criminal sexual conduct conviction and 15-30 years on the first degree criminal sexual conduct conviction.

(Sentencing Transcript, May 10, 2002, 28-29). Petitioner appealed his conviction to the Michigan

Court of Appeals, asserting the following claims:

> I. Trial counsel was constitutionally ineffective, contrary to the Sixth Amendment of the United States Constitution and Article I, Section 20 of the Michigan Constitution requiring reversal where trial counsel failed to conduct basic pretrial investigation, litigate evidentiary matters before trial, object to the admission of certain evidence at trial, and present a viable defense.
>
> II. The jury verdict must be reversed where the verdict was against the great weight of the evidence.
>
> III. Newly discovered evidence warrants the granting of a new trial for the Defendant-Appellant.
>
> IV. The cumulative effect of the prosecutor's misconduct warrants the granting of a new trial for the Defendant-Appellant.
>
> V. The cumulative effect of the errors at trial denied the Defendant a fair, impartial trial, warranting reversal.
>
> VI. The trial court abused its discretion in scoring offense variables 8, 11, and 13 where there was not evidence to support the scoring of these variables.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v.*

*Swiatkowski,* No. 241754, Opinion (Mich. Ct. App., May 25, 2004). Asserting the following claims,

Petitioner moved in the Michigan Supreme Court for leave to appeal:

> I. Trial counsel was constitutionally ineffective, contrary to the Sixth Amendment of the United States Constitution and Article I, Section 20 of the Michigan Constitution requiring reversal where trial counsel failed to conduct basic pretrial investigation, litigate evidentiary matters before trial, object to the admission of certain evidence at trial, and present a viable defense.

10

II.     The jury verdict must be reversed where the verdict was against the great weight of the evidence.

III.    Newly discovered evidence warrants the granting of a new trial for the Defendant-Appellant.

IV.     The cumulative effect of the prosecutor's misconduct warrants the granting of a new trial for the Defendant-Appellant.

V.      The cumulative effect of the errors at trial denied the Defendant a fair, impartial trial, warranting reversal.

VI.     The trial court violated Defendant-Appellant's Sixth Amendment right to a jury in making specific findings of facts on offense variables 8, 11, and 13, or, in the alternative, the trial court abused its discretion in scoring offense variables 8, 11, and 13 where there was not evidence to support the scoring of these variables.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Swiatkowski*, No. 126580, Order (Mich., April 26, 2005). On April 25, 2006, Petitioner initiated the present action, asserting the following claims:

I.      Trial counsel was constitutionally ineffective, contrary to the Sixth Amendment of the United States Constitution requiring reversal where trial counsel failed to conduct basic pretrial investigation, litigate evidentiary matters before trial, object to the admission of certain evidence at trial, and present a viable defense.

II.     Newly discovered evidence warrants the granting of a new trial for the Petitioner.

III.    The cumulative effect of the prosecutor's misconduct denied the Petitioner his constitutional right to due process of law which warrants the granting of a new trial for the Petitioner.

IV.    The trial court violated Petitioner's Sixth Amendment
       right to a jury in making specific findings of facts on
       offense variables 8, 11, and 13.

## **STANDARD OF REVIEW**

Swiatkowski's petition is subject to the provisions of the Antiterrorism and Effective

Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the

substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a
       person in custody pursuant to the judgment of a State court
       shall not be granted with respect to any claim that was
       adjudicated on the merits in State court proceedings unless
       the adjudication of the claim —

    (1)    resulted in a decision that was contrary to, or involved
       an unreasonable application of, clearly established
       Federal law, as determined by the Supreme Court of
       the United States, or

    (2)    resulted in a decision that was based on an
       unreasonable determination of the facts in light of the
       evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the Supreme] Court has on a set

of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also,*

*Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the

relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts a *de novo* review. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.     Ineffective Assistance of Counsel

Petitioner asserts that his Sixth Amendment right to the effective service was violated by his trial counsel's performance. Petitioner asserts several grounds for relief, each of which is examined below.

To establish that he was denied the right to the effective assistance of counsel,

Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

A.      Pretrial Investigation

Petitioner faults his counsel for failing to properly investigate two matters. Petitioner first claims that his attorney was ineffective for failing to investigate allegations of sexual assault that Ashley Abrams made against David Rhodes. Petitioner also claims that his attorney was ineffective for failing to investigate an incident in which Abrams allegedly sought out pornography in somebody else's residence.

1.      David Rhodes

On August 5, 2003, the trial court conducted an evidentiary hearing on Petitioner's motions for new trial and for ineffective assistance of trial counsel. David Rhodes testified at this hearing. Rhodes testified that in 1997 or 1998, Ashley Abrams accused him of sexual assault. (Hearing Transcript, August 5, 2003, 36-37). Rhodes was never contacted by Petitioner's trial counsel, Edwin Hettinger. (Tr. 38).

Petitioner asserts that Hettinger's failure to contact Rhodes and investigate Abrams' claims against him constitutes ineffective assistance. Specifically, Petitioner asserts that evidence of this prior accusation could have been utilized at trial in one of several ways. First, Petitioner argues that such evidence demonstrated that Abrams "had sufficient knowledge of sexual matters and the court system to be able to fabricate the allegations in this case." Petitioner argues that his jury was "entitled to hear that Ms. Abrams had made a prior false accusation against another man." Petitioner further asserts that evidence concerning Abrams' allegations against Rhodes "would have demolished the People's explanation for the delay in reporting in this case." Finally, Petitioner asserts that the evidence in question could have demonstrated that Abrams' "false accusation against him was the product of unresolved trauma inflicted by Mr. Rhodes."

Petitioner's argument fails to account for one significant fact, namely that David Rhodes pleaded no contest and was convicted of sexually assaulting Ashley Abrams. (Tr. 37-39). Petitioner is also incorrect when he asserts that his trial counsel failed to investigate the incident concerning David Rhodes. Hettinger testified that he was fully aware of David Rhodes and that he had been convicted of sexually assaulting Abrams. (Tr. 46-47, 62). Hettinger testified that he made a strategic decision not to present evidence of Abrams' allegations against Rhodes because such

would have "opened the door" to the jury learning that Rhodes had been convicted of sexually assaulting Abrams. (Tr. 62).

Petitioner has failed to overcome the presumption that Hettinger's decision constituted sound trial strategy. The Court fails to discern how Petitioner's cause would have been advanced by presenting evidence that another man had been convicted of sexually assaulting Abrams. Such could only have served to bolster Abrams' credibility in the jurors' eyes. Petitioner has likewise failed to demonstrate how such evidence would have led to a different result.

The Michigan Court of Appeals rejected Petitioner's ineffective assistance claim on the ground that Hettinger investigated this particular matter and "made a tactical decision" not to pursue the matter "after carefully weighing the evidence's potential to help defendant against its potential to harm him." *People v. Swiatkowski,* No. 241754, Opinion at 1-2 (Mich. Ct. App., May 25, 2004). This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

### 2. Incident with Alice Schoetozw

At Petitioner's Ginther hearing, Alice Schoetozw testified that she knew Ashley Abrams in 1996 and 1997. (Hearing Transcript, August 5, 2003, 36-37). Schoetozw and her mother, Anna Owens, both testified that on one occasion when Abrams visited Schoetozw, the two watched pornography that Schoetozw's mother had hidden in a kitchen cupboard. (Tr. 30-34). Schoetozw testified that she was aware that her mother had hidden pornography in the cupboard and

informed Abrams of its existence. (Tr. 35). Schoetozw testified that she was not sure whose idea it was to watch the pornography. (Tr. 35).

Petitioner argues that his trial counsel was ineffective for failing to present evidence concerning this incident. Specifically, Petitioner asserts that this evidence "would have demonstrated that Ms. Abrams knew full well that adults hide pornographic items and that she had an interest in adult materials inappropriate for her age." Petitioner asserts that this evidence would also have "dispelled the unspoken assumption that Ms. Abrams was too naive and inexperienced and lacked sufficient knowledge to fabricate these allegations." Petitioner also asserts that this evidence would have supported Petitioner's theory that Abrams discovered his pornography by "actively discovering it outside his presence." Petitioner further asserts that this evidence "would have negated the People's theory that Petitioner was somehow 'grooming' Ms. Abrams."

Whether Abrams knew that adults, in general, may hide pornography in their house hardly seems relevant in this matter. Likewise, the Court fails to grasp the significance or relevance of whether Abrams "had an interest" in pornography. The question at trial was whether Petitioner sexually assaulted Abrams, not whether Abrams was curious about or had an interest in sex or sexual activity. Moreover, Schoetozw's testimony does not appear nearly as significant as Petitioner asserts. Contrary to Petitioner's suggestion that Abrams rummaged through Anna Owens' cupboards in a desperate search for pornography, Schoetozw testified that she was the one that informed Abrams of the existence of her mother's hidden pornography. Schoetozw also testified that she could not recall whose idea it was to watch the pornography.

As for Petitioner's argument that the evidence in question would have negated the prosecution's "grooming theory," the Court is not persuaded. Petitioner appears to argue that

Abrams could not have been subject to "grooming" if she had any prior exposure to pornography

or other adult material. With respect to the issue of "grooming," the following exchange occurred

between the prosecutor and Dr. Henry:

> Q: In my hypothetical, the little girl was shown some pornographic material and some sexual aids or marital aids, sex toys. At the age of twelve, would that be an unusual occurrence in a case like this?
>
> A: Well, I mean - I can't say unusual occurrence. It happens in some; it doesn't in others, depending upon the circumstance, so yes. Does it happen? Have I seen that frequently? Yes. Does it happen in every case? No. It just depends on the circumstance.
>
> Oftentimes, what we call grooming behavior can happen where an offender is kind of exposing a child to different parts, to kind of see how far he or she will go in terms of whether or not, whether its pornographic material, kind of getting the idea put forth, little touches, little statements that sometimes can occur to kind of serve as a bridge to see whether the child will keep quiet about that pornographic material, or in terms of sometimes after it started, that it can obviously be sexually arousing for the person and engage in that with that child, so there's a variety of different reasons for that.

(Trial Transcript, March 13, 2002, 123-24).

The question, therefore, is not whether Abrams had previously witnessed

pornography or been shown sex toys, but whether she would "keep quiet" after being shown

pornography and sex toys by Petitioner, thereby emboldening Petitioner to engage in more sexually

explicit behavior. *See also*, *People v. Steele*, - - - N.W.2d - - -, 2009 WL 1077380 (Mich. Ct. App.,

Apr. 21, 2009) (recognizing that the purpose of "grooming" is to "desensitize the victims to the

impropriety of the sexual contact, in order to escalate it over time"). The evidence presented at trial

19

supported this theory and the incident concerning Abrams and Schoetozw does not, in the Court's estimation, detract from such.

Petitioner's counsel testified that he was aware of the incident concerning Abrams and Schoetozw, but chose not to present evidence of such because of a concern that "it may have backfired." (Hearing Transcript, August 5, 2003, 47-48, 61-62). This does not appear to be an unreasonable concern considering Schoetozw's testimony at the Ginther hearing. Schoetozw testified that she was the one that informed Abrams of the existence of her mother's hidden pornography. Schoetozw also testified that she could not recall whose idea it was to watch the pornography. To the extent that such testimony suggests Abrams' willingness to acquiesce to another's request to view pornography, a reasonable juror could find that such evidence supports the prosecution's theory in this case.

Again, Petitioner has failed to overcome the presumption that Hettinger's decision not to present evidence of this incident constituted sound trial strategy. Petitioner has also failed to demonstrate how such evidence would have led to a different result. The Michigan Court of Appeals rejected Petitioner's ineffective assistance claim, finding that counsel investigated the matter and "made a tactical decision" not to pursue the matter "after carefully weighing the evidence's potential to help defendant against its potential to harm him." *People v. Swiatkowski,* No. 241754, Opinion at 1-2 (Mich. Ct. App., May 25, 2004). This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

B.     Admissibility of Adult Material

Petitioner faults his counsel for failing to challenge the admissibility of the "various adult materials" recovered from Petitioner's residence and the Al Capone house. Petitioner asserts that the introduction of this evidence constituted "a direct assault on his character." Petitioner further asserts that the affidavit supporting the search of the Al Capone house contained "stale" information, thus rendering the subsequent search thereof invalid as lacking probable cause.

With respect to the admissibility of the adult materials, the Court finds Petitioner's argument unpersuasive. As the Michigan Court of Appeals observed:

> the evidence and its location were relevant to the prosecutor's theory that defendant showed these items to the victim to groom her for later assaults. The items were not introduced to show defendant's character, but rather to provide the jury with a complete picture of the circumstances surrounding the assaults. Therefore, the trial court would have denied any objection based on MRE 404(b).

*People v. Swiatkowski,* No. 241754, Opinion at 3 (Mich. Ct. App., May 25, 2004).

This determination is a reasonable interpretation of Michigan evidentiary law. Thus, even if counsel were deficient for seeking to suppress this evidence, Petitioner cannot establish that he was prejudiced by counsel's failure. This claim, therefore, raises no issue on which habeas corpus relief may be granted.

As for Petitioner's argument regarding the search warrant of the Al Capone house, the Court notes that Petitioner has failed to submit evidence in support thereof. Petitioner asserts that the affidavit submitted in support of the warrant authorizing the search of the Al Capone house contained "stale" information, rendering the search invalid. The Court cannot assess Petitioner's argument, however, because he has failed to submit the affidavit in question. Petitioner asserts that the affidavit in question is attached as Exhibit 4 to his memorandum in support of his petition. (Dkt.

#2 at 18). This particular exhibit is a copy of the affidavit submitted in support of Petitioner's residence, not the Al Capone house. (Dkt. #2, Exhibit 4). Petitioner has not alleged that the Al Capone house was searched pursuant to a warrant that authorized the search of a different property, only that the affidavit submitted in support of the search warrant for the Al Capone house was insufficient to support the search thereof. In the absence of any evidence that the search of the Al Capone house was improper, the Court rejects Petitioner's argument. The Court also notes that the Michigan Court of Appeals rejected this particular claim finding Petitioner's "staleness" argument to be without merit. *People v. Swiatkowski,* No. 241754, Opinion at 2 (Mich. Ct. App., May 25, 2004). This decision is a reasonable interpretation of Michigan evidentiary law. Accordingly, this claim raises no issue on which habeas corpus relief may be granted.

C.      Expert Witness

Petitioner next alleges that his trial counsel rendered ineffective assistance by failing to secure the testimony of an expert witness to counter the testimony offered by Dr. Henry.

At the Ginther hearing, Petitioner's trial counsel, Edwin Hettinger, testified that he discussed with Petitioner and his wife the possibility of hiring an expert witness. (Hearing Transcript, August 5, 2003, 51-52). According to Hettinger, Petitioner and his wife both concluded that they "couldn't afford" to hire an expert witness. (Tr. 51-52). Petitioner and his wife both disputed Hettinger's account, testifying that Hettinger never discussed with them the possibility of hiring an expert witness. (Tr. 8-9, 65-66). Petitioner's sister, mother, and father also testified that they did not recall anybody discussing the possibility of hiring an expert witness. (Tr. 18, 22-23, 26-27).

Relying on the testimony of Petitioner's counsel, the Michigan Court of Appeals rejected this particular claim. *People v. Swiatkowski,* No. 241754, Opinion at 2 (Mich. Ct. App., May 25, 2004). While Petitioner obviously disputes Hettinger's testimony, the determination by the Michigan Court of Appeals is not based on an unreasonable assessment of the evidence. Furthermore, as the appellate court noted, Petitioner has offered absolutely no evidence that an expert witness would have advanced his cause. As the court correctly concluded, "defendant merely speculates about the benefit an expert witness could have provided his case." *Id.* To establish that his counsel rendered ineffective assistance, Petitioner must demonstrate that he was prejudiced by his attorney's alleged shortcoming. Mere speculation is insufficient to establish prejudice. The Court concludes, therefore, that this claim raises no issue on which habeas relief may be granted.

      D.      Photograph of Tattoo

Prior to the trial at issue in this matter, which occurred in St. Joseph County, Petitioner was charged in Cass County with first degree criminal sexual conduct for actions involving Ashley Abrams. (Dkt. #2 at 3). The jury in the Cass County proceeding acquitted Petitioner of first degree criminal sexual conduct, but found him guilty of fourth degree criminal sexual conduct. *Id.* at 4. Edwin Hettinger represented Petitioner during the Cass County trial. During this earlier proceeding, Hettinger introduced a photograph of a tattoo located on the upper portion of one of Petitioner's legs. (Dkt. #2, Exhibit 7). Hettinger did not, however, introduce this photograph during the second trial in St. Joseph County. Petitioner claims that counsel failure to introduce this photograph at the latter proceedings constituted ineffective assistance.

At the first trial Hettinger asked Abrams whether "she had seen any distinguishing

marks [on Petitioner] when allegedly his pants were down." (Trial Transcript, March 13, 2002, 88-89; Hearing Transcript, August 5, 2003, 43). While Abrams was unable to specifically describe Petitioner's tattoo, Abrams did testify that Petitioner had a tattoo. (Trial Transcript, March 13, 2002, 88-89; Hearing Transcript, August 5, 2003, 43-44). When Abrams was questioned about this matter at the second trial, she testified that while she unable to previously describe Petitioner's tattoo on the witness stand, she later described the tattoo to her dad. (Trial Transcript, March 13, 2002, 88). Abrams then described Petitioner's tattoo in detail. (Tr. 92-93).

At the Ginther hearing, Hettinger testified that he made a strategic decision not to introduce the photograph of Petitioner's tattoo at the second trial. (Hearing Transcript, August 5, 2003, 44). Hettinger subsequently experienced "second thoughts" about the matter and attempted to introduce the photograph during his re-direct examination of Petitioner. (Trial Transcript, March 14, 2002, 52-53; Hearing Transcript, August 5, 2003, 44). The prosecutor objected on the ground that introduction of the photograph exceeded the scope of his cross-examination. (Trial Transcript, March 14, 2002, 52). The trial judge sustained the objection. (Trial Transcript, March 14, 2002, 52-53). With respect to his decision not to introduce the photograph, the following exchange occurred between Hettinger and a prosecuting attorney:

Q:      With respect to the photograph, why were you
        reluctant to show it to the jury in the St. Joseph
        County trial as your - let me finish the question.

A:      Sorry.

Q:      - as your client testified on direct examination?

A:      Actually, Ashley had already testified, and I showed
        through cross-examination some discrepancy in her
        different statements at different times. I didn't want
        to then go into the production of it through my client

24

because I felt that at that point we would get crossed - we could cross on her ability to answer the question because in the transcript of the jury trial, page 89, her answer is "a tattoo." And I had serious concern over the jury having that emphasized to them, and in that way, I felt we had accomplished what we could there.

Q:   Had she testified something about a tattoo during her testimony in the People's case?

A:   I believe so. I think that was covered. I haven't reviewed that part of the transcript before today so I'm going on memory from last year, but I do believe that was covered by the -

Q:   But you felt you couldn't assist the impact of the cross-examination because the witness had identified an identifying mark already in previous testimony, is that correct?

A:   Yes, it is.

Q:   And - have you seen the photograph, the tattoo?

A:   Yes.

Q:   And did you feel that exposure of that to the jury could cut both ways?

A:   My biggest concern is that it would cut directly against us because it was a tattoo, and my question was here, "Did you see any distinguishing marks?" I didn't ask her, "Did you see any tattoos?" She came back with "a tattoo." So I felt there was a lot of impact there that I had hoped to avoid.

Q:   And did you feel that the tattoo itself might - might influence a jury against your client or photograph of it?

A:   There was some possibility of that. It wasn't my overriding concern.

Q:   But, essentially, showing them the photograph, in

> your initial judgement anyway, would have merely
> emphasized the fact that she was correct in her direct
> examination in Cass County?
>
> A:     Correct, yes.

(Tr. 59-61).

Petitioner has failed to overcome the presumption that Hettinger's decision not to introduce the photograph in question constituted sound trial strategy. Petitioner has also failed to demonstrate how such evidence would have led to a different result. The Michigan Court of Appeals rejected Petitioner's ineffective assistance claim, finding that Hettinger's tactics constituted a valid strategic decision. *People v. Swiatkowski,* No. 241754, Opinion at 2 (Mich. Ct. App., May 25, 2004). The court further held that even if counsel's decision was faulty, Petitioner suffered no prejudice therefrom. Specifically, the court stated, "trial counsel had already introduced testimony regarding the tattoo, so the photograph itself would not have affected the outcome of the trial." *Id.* The determination by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

**II.**     **Prosecutorial Misconduct**

Petitioner asserts that "the Prosecutor's failure to provide defense counsel before trial exculpatory information concerning the David Rhodes case after a defense request for exculpatory information violated Petitioner's due process rights."  Petitioner asserts that the prosecutor's alleged misconduct violates the holding of *Brady v. Maryland*, 373 U.S. 83 (1963).  Specifically, Petitioner faults the prosecutor for failing to produce "any information concerning Ms. Abrams' accusation against David Rhodes including but not limited to, the charging documents and police reports generated in the Rhodes case."

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith  or bad faith of the prosecution."  *Wilson v. Mitchell*, 498 F.3d 491, 512 (6th Cir. 2007) (quoting *Brady*, 373 U.S. at 87).  The material which must be disclosed under *Brady* "encompasses impeachment evidence as well as exculpatory evidence."  *Wilson*, 498 F.3d at 512 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  To establish a *Brady* violation, Petitioner must establish: (1) the prosecution suppressed or withheld evidence, (2) such evidence was favorable to the defense, and (3) the suppressed evidence was material.  *See Bushard v. Yukins*, 2004 WL 74659 at *1 (6th Cir., Jan. 7, 2004) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).  The materiality requirement is satisfied where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Whitley*, 514 U.S. at 435).  In short, Petitioner must demonstrate a "reasonable probability of a different result."  *Dretke*, 540 U.S. at 698 (quoting *Whitley*, 514 U.S. at 434).

Petitioner's claim is unpersuasive. The only specific items that Petitioner claims the prosecutor failed to produce are "the charging documents and police reports generated in the Rhodes case." As detailed above, Rhodes was convicted of sexually abusing Ashley Abrams. The Court fails to discern how the alleged failure by the prosecution to produce the police reports and charging documents concerning Rhodes' crime in any way "undermines confidence" in Petitioner's conviction or that the production of such would have led to a different result.

Petitioner also alleges that the prosecutor engaged in misconduct by misleading the jury. Specifically, Petitioner argues that the prosecutor "misled the jury" by blaming Petitioner for the behavioral changes Abrams experienced in the summer and fall of 2000. Petitioner asserts that it was improper for the prosecutor to argue that such was the case when he "knew that Mr. Rhodes may have been responsible for her changes in behavior." Petitioner asserts that the prosecutor further misled the jury by "present[ing] expert testimony which provided an explanation for the complainant's delay in reporting based on the assumption that this was a first time experience (reporting of an assault) for the complainant." Petitioner asserts that the prosecutor should have questioned Dr. Henry "concerning the effect of a prior sexual assault on [Abrams'] changes in behavior or the delay in reporting."

As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168,

181 (1986)).  Thus, even if the challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court must consider the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.  *Id.*

The Court discerns nothing improper about the conduct in question.  The prosecutor pursued a theory of the case that was supported by the evidence.  To the extent that Petitioner believed the prosecutor's theory to be incorrect or incomplete, he had the opportunity to counter such.  As previously noted, Petitioner's counsel testified at the Ginther hearing that at the time of Petitioner's trial he was fully aware of Abrams' previous allegations against David Rhodes. (Hearing Transcript, Aug. 5, 2003, 46-47).  Counsel further testified that he viewed the court file concerning the matter.  (Tr. 47).  While Petitioner's trial counsel could have presented evidence concerning David Rhodes and the fact that he had been convicted of sexually assaulting Ashley Abrams, he made the choice not to do so.  As discussed above, this was not an inappropriate strategic decision.

The Michigan Court of Appeals rejected these claims.  *People v. Swiatkowski,* No. 241754, Opinion at 3 (Mich. Ct. App., May 25, 2004).  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  As such, this claim presents no issue on which habeas corpus relief may be granted.

**III.**          **Newly Discovered Evidence**

At the Ginther hearing, Christopher Ramsey, Ashley Abrams' father, testified that subsequent to Petitioner's trial, Abrams accused him of "sexual misconduct with an act of penetration." (Hearing Transcript, August 5, 2003, 14).[2] Petitioner asserts that he is entitled to a new trial on the basis of this newly discovered evidence.

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Court observed that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400, *see also*, *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) ("The Supreme Court has held that newly discovered evidence does not constitute a freestanding ground for federal habeas relief but, rather, that the newly discovered evidence can only be reviewed as it relates to an 'independent constitutional violation occurring in the underlying state criminal proceeding.'") (citations omitted).  As the *Herrera* Court stated, "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact." *Herrera*, 506 U.S. at 400.

Petitioner asserts that "this newly discovered evidence, coupled with the failure of trial counsel to present the accusation made against Rhodes, demonstrates that Mr. Swiatkowski was denied a fair trial." The Court is not persuaded. As noted above, in the context of a petition for writ of habeas corpus, newly discovered evidence "can only be reviewed as it relates to an independent

---

[2] Petitioner's counsel was prevented from questioning Abrams' father further on the ground that such was not relevant. (Tr. 14-15). Counsel was permitted to make an offer of proof for the record, however, as to the testimony that Ramsey would allegedly offer if questioned about the matter. (Tr. 15-16). The Court notes that counsel's offer of proof does not constitute evidence, but is merely hearsay. The Court notes that Petitioner has not offered any evidence (e.g., affidavit) from Ramsey or any other source concerning this alleged matter.

constitutional violation occurring in the underlying state criminal proceeding." Ramsey's testimony does not *relate to* Petitioner's ineffective assistance of counsel claim because as Ramsey testified Abrams did not accuse him of wrongdoing until *after* Petitioner's trial. Petitioner is, in effect, asking the Court to find that his trial attorney was ineffective (or that his constitutional rights were otherwise violated) because his attorney failed to predict that in the future Abrams would make an allegedly false allegation of sexual misconduct against her father. The Court is aware of no authority that permits such. The Court concludes, therefore, that Petitioner is not entitled to relief based on his claim of newly discovered evidence.

IV.         **Blakely Claim**

Petitioner asserts that his Sixth Amendment rights were violated because he "is serving a sentence based in part on facts not found by a jury" in violation of the Supreme Court's ruling in *Blakely v. Washington*, 542 U.S. 296 (2004).

The Court notes that Petitioner did not assert this particular claim to the Michigan Court of Appeals because *Blakely* was not decided until after the Michigan Court of Appeals issued its decision in this matter. Petitioner asserted his *Blakely* claim in the Michigan Supreme Court, but, as previously noted, that court denied Petitioner leave to appeal. This raises the question whether Petitioner has properly exhausted his *Blakely* claim.

While exhaustion requires that the petitioner present his claims to the state's highest court, presenting his claims to *only* the state's highest court may not suffice. The Michigan Supreme Court conducts discretionary review of appeals by application for leave to appeal. In *Castille v. Peoples*, 489 U.S. 346 (1989), the United States Supreme Court held that presentation of an issue

for the first time on discretionary review to the state's highest court does not satisfy the "fair presentation" requirement where the court declines to exercise its discretion to review the matter. *Id.* at 351.   Applying *Castille*, the Sixth Circuit has likewise determined that the exhaustion requirement is not satisfied where a petitioner first presents a claim on discretionary appeal to the state's highest court, unless that court opts to review the merits of the claim.   *See*, *e.g.*, *Granger v. Hurt*, 215 Fed. Appx. 485, 491 (6th Cir., Feb. 8, 2007); *Hall v. Huffman*, 2000 WL 1562821 at *3 (6th Cir., Oct. 11, 2000).   The application of this reasoning to the present circumstance, however, seems inappropriate, as Petitioner raised this issue as soon as he was able.   The Court has been unable to locate authority addressing this particular circumstance, but would nevertheless be inclined to find that Petitioner properly exhausted this particular claim.   The Court need not resolve this issue, however, because even if Petitioner has not properly exhausted this claim it may nonetheless be denied on the merits.   *See* 28 U.S.C. § 2254(b)(2).   As discussed below, this claim is without merit.

In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."   *Id.* at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).   Petitioner asserts that his sentence violates this rule because the sentencing court, in fashioning his sentence, relied upon facts which were neither admitted nor proven beyond a reasonable doubt.

In *Blakely*, the defendant pleaded guilty to second degree kidnaping involving domestic violence and use of a firearm.   *Blakely*, 542 U.S. at 298-99.   In so doing, Blakely admitted "the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but

no other relevant facts." *Id.* at 299. Washington law provided that the "standard range" to which a defendant, convicted of this particular offense, could be sentenced was 49-53 months. However, the sentencing court was permitted to impose a sentence in excess of the "standard range" if it found "substantial and compelling reasons justifying an exceptional sentence." Before imposing an "exceptional sentence," the sentencing court was required to "set forth findings of fact and conclusions of law supporting it." *Id.*

The State recommended that Blakely receive a "standard range" sentence of 49-53 months. *Id.* at 300. The sentencing court rejected this recommendation, however, and, finding that Blakely acted with "deliberate cruelty," imposed an "exceptional" sentence of 90 months. *Id.* at 300-01. As the *Blakely* Court recognized, under Washington law, the court "could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea," but instead could do so only based on the court's additional determination that Blakely acted with "deliberate cruelty." *Id.* at 304. The Court held, therefore, that this sentence violated Blakely's Sixth Amendment right to trial by jury because it was predicated on facts that were neither admitted by Blakely nor found by a jury. *Id.* at 301-05.

The *Blakely* Court, however, made clear that its holding applied only to "determinate-sentencing schemes" such as that employed by the State of Washington. *Id.* at 308-09. The Court recognized that *indeterminate* sentencing schemes do not run afoul of the Constitution because while such schemes may sanction "judicial discretion" in sentencing, they do not accomplish such "at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id.* at 308-09. As the Court recognized:

> Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he

deems important to the exercise of his sentencing discretion.  But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence - and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.  In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail.  In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence - and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

*Id.* at 309.

As is well recognized, the State of Michigan employs an indeterminate sentencing scheme.  *See, e.g., Butz v. Berghuis*, 2009 WL 33462 at *3 (W.D. Mich., Jan. 5, 2009) (Maloney, C.J.); *Jenkins v. Harry*, 2009 WL 103991 at *2 (W.D. Mich., Jan. 14, 2009).  Petitioner was convicted of one count of first degree criminal sexual conduct and one count of second degree criminal sexual conduct.

Pursuant to Michigan law, the conviction for first degree criminal sexual conduct subjected Petitioner to a sentence of "life or for any term of years."  Mich. Comp. Laws § 750.520b (2000).  The conviction for second degree criminal sexual conduct subjected Petitioner to a sentence of "not more than 15 years."  Mich. Comp. Laws § 750.520c (2000).  Petitioner was sentenced to serve 6-15 years in prison on the second degree criminal sexual conduct conviction and 15-30 years on the first degree criminal sexual conduct conviction.  Petitioner's sentence is entirely consistent with Michigan law.  Thus, when Petitioner committed his crimes he knew that he could possibly receive sentences of this magnitude.  Because Petitioner received a sentence within the range permitted by Michigan law as a result of his convictions, any additional fact-finding in which the trial court may have engaged did not violate Petitioner's rights under *Blakely* or the Sixth

34

Amendment.  Accordingly, this claim raises no issue on which habeas relief may be granted.


## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Swiatkowski's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  July 13, 2009                              __/s/ Ellen S. Carmody_____
                                                  ELLEN S. CARMODY
                                                  United States Magistrate Judge